This is the estate of Isringhausen for the appellant, Mr. Massen, did I pronounce that correctly? Massen. And Ms. Lorton for the appellee and Mr. Whitman for the appellee. May it please the court, counsel, first of all I'd like to apologize for delaying you. I had this calendared as a sign in at 11 a.m. and obviously that wasn't correct, so I very much apologize. My name is Stephen Massen. I represent Jane Isringhausen, who is the widow of Floyd Isringhausen. She's here with me today. This is an estate challenge. We have been before this court one time before. It has to do with, I'll cut to the chase here real quickly, but I want to identify the parties first of all. It's the second marriage of Floyd Isringhausen and Jane Isringhausen, my client. They were married in 1981. Floyd had been married previously, had five children from his earlier marriage. Jane had been married previously, has one daughter from that earlier marriage. She was the librarian for the Jersey Community High School. He was a farmer in the area. At the time of their marriage they entered into a prenuptial agreement in September, sometime in 1981. Basically the purpose of the prenuptial agreement was to preserve the three farms that Floyd owned for his five children. There was a provision in the prenuptial agreement having to do with after acquired property. You'll hear it referred to as paragraph 4F of the agreement. And that basically said that after acquired property that's acquired after the marriage is jointly held as tenants in common by the husband and the wife. And that becomes an issue later. The couple remained married from 1981 until Floyd passed away in 2008. It was a 27-year marriage. Floyd was 59 when they were married and Jane was 51. So it had the usual circumstances related to 27-year marriage where retirement is involved, the final illness of Floyd, and his passing away. And there was very little discussion or adherence, I think you'll find, although it doesn't become an issue in the appeal here, thankfully. Very little reference to the anti-nuptial agreement during the time of the marriage. It was a typical marriage between a husband and wife where the husband is becoming elderly and retiring and the wife is retired and the issues related to health problems and care keeping and so forth. Floyd passed away in December 2008. In, I believe, May of 2007, he prepared a will and he made reference to this paragraph 4F of the anti-nuptial agreement. And in the will he said, with regard to paragraph 4F of the will and property acquired after the marriage, I did not intend this to include machinery or equipment or livestock that are purchased for the farms. Those were simply replacements of things that we owned at the time and that was not intended to be part of that. He also acknowledged, and I won't get into the details, it's all set out in our briefs and the appendix to the briefs and so forth. He also indicated that if the language of the agreement is not construed that way, first of all he said, this is what I intend. This is what I intended by that agreement in 1981. I'm therefore giving a car and a camper and a couple of other things to Jane. If it is not construed by the court that way, and in fact she is entitled to, after acquired property, including such things as machinery and livestock and so forth, then she doesn't get those items that he delineated. But at the time he passed away in December of 2008, he no longer owned those items anyway. He passed away in December 2008. On January 9, 2009, the estate was opened by the executors. The executors were Roger and Clayton. Roger was the oldest son of the five children. Clayton was a nephew, I believe. And Roger actually didn't take under the will. He had had some financial difficulties previously. Jane and Floyd had assisted him in part by selling one of the farms. So he took, in effect, when he was in need and during their lifetime, Floyd's lifetime. And so it's only the other four children who were beneficiaries under the will. The prenuptial agreement made three provisions, or two provisions basically, three provisions for Jane. One was a life estate in the farmhouse, in the farm where they lived. A second was a $50,000 life insurance policy. He made her the beneficiary of that when they got married in 1981. And then the third was this paragraph 4 of the agreement, which indicated that after acquired property, after the consummation of marriage, was going to be shared. The estate was opened on January 9, 2009. There were some meetings involving reading of the will and so forth, and Jane basically was told, you don't take under the will. You're provided for in the prenuptial agreement, so you really don't have to be involved in this case. There might be some dispute about whether she had access to counsel for the estate and so forth, but those are issues for another day. I was first contacted in late June of 2009 by Jane. Well, first of all, they filed their letters asking for entry of a probate estate in January 2009. They then filed publication of notice to creditors in the Jersey community newspaper, which by statute has to be published on three consecutive weeks. And that's in May of 2009 in the circuit court records. It indicates it was in fact published. That notification, which was submitted by publication only, said that any claims brought against the estate must be filed by July 15, 2009. Jane first contacted me, I believe in late June 2009, because she had read the local advertiser, the local shopper, and the farm on which she lived and in which she had a life estate was being sold in fee simple. And the advertisement indicated two houses, including the house she lived in and so forth. So she first contacted me and said, they're trying to sell my house. And so the first thing I did was I filed the lease pendants with the recorder's office in Jersey County, putting on notice anyone who happened to buy the farm that there was in fact this anti-nuptial agreement providing for a life estate to Jane. The next thing I did then was I went to Mr. Whitman's office, who was handling the estate, and I took a look at the court file. I don't remember if I took a look at the publication notice or not, or the cutoff of July 15. But on July 22, we filed three items with the court. One was a renunciation of the will under the widow's right to take against the will if in fact the anti-nuptial agreement was not enforceable. The anti-nuptial agreement did provide that she waived her right to take against the will. The second thing I filed was a claim against the will on the basis of this paragraph 4F of the pre-nuptial agreement saying that she had a right to after acquired property and we would have to litigate that and she was a known claimant to the estate. And the third thing I asked for was a jury. We did some discovery and we reached the point where we thought the issue of whether the pre-nuptial agreement was enforceable or not had been brought to a legal question and I filed a motion for summary judgment on enforceability of the anti-nuptial agreement. The estate in fact filed a motion for summary judgment on their behalf. The court ruled in the estate's favor. We appealed to the 4th District Court and in a Rule 23 order that this court entered, I believe, it was sometime in the summer of 2011, I see dates of June 18 and August 18, I'm not sure which one it actually was, but in the summer of 2011, this court found that in fact the anti-nuptial agreement was enforceable. What they did, what this court did, was remanded for the remaining claim, which is the claim against the estate. And the court found that these are issues that have to be resolved by the trial judge when it's remanded on the other claim, which is the claim against the estate. The mandate of this court was filed, was entered, I think, September 20, 2011. But on September 15, once we knew that the court case was being remanded for further proceedings on the claim against the estate under the pre-nuptial agreement, I filed some discovery, including a request to admit, a supplemental request for interrogatories, and a supplemental request to produce documents. And what this had to do with, primarily, was some bank accounts. There were some bank accounts that Jane and Floyd basically had three accounts. Two of those were separate, a third one was what they called their farm account, but everything went into that account. And from that account there had been some certificates of deposit from the rents of the farms. The rents for the farms basically ran $100,000 a year, approximately. But these had to do with 2007 rents, 2008 rents had not yet been received, I don't believe. But a certificate of deposit in the names of the children had been purchased by Floyd without consultation with Jane from that account for $100,000 prior to his death. What we wanted to do was do some discovery about those issues, about whether, in fact, those were marital property or not. The position of the estate was that this was part of the farm that was owned by Floyd, therefore it was not marital property. The position we took, and we believe was supported by paragraph 4F, was that this was, in fact, marital assets. And in response to our discovery, which was the opening salvo, we had taken depositions of the four children and of Jane before we brought our first appeal on the renunciation of the will. We have never taken depositions of the executors of the estate. We've also never taken the deposition of the physician of Floyd during his last illness. There are a number of things that the family did, that the couple did, that didn't follow the provisions of the Anti-Nuptial Agreement. For example, Jane got a teacher's pension, she got teacher's insurance, she had a Floyd insurance policy, she met him dollar for dollar from her teacher's pension for Social Security, various things like that. You know, the typical things that a husband and wife during retirement and last illness and so forth would do to care for one another. Similarly, during the 2000s, year by year, they maximized the gifts that they could give to the children of farm. And one of the farms was that 84% had been given to the children at that point. And each year, both Floyd and Jane maximized the amount of a gift of that farm that they could give to the children without having tax ramifications. Now keep in mind that pursuant to the prenuptial agreement, Jane didn't own that farm. But in order to maximize the amount that would not be subject to tax, she donated a portion of that farm to the children too, and that never became an issue. After we filed that discovery, and shortly after this case had been remanded by this court for determination of the claim under their prenuptial agreement, the estate first of all filed an objection to our discovery. And then they filed a motion to dismiss, saying that our claim had not been timely filed. And that's the primary issue that we have here today. You will find that we believe that Jane Isringhausen was a known claimant or a claimant who should have been known by the estate, by the executors of the estate. The prenuptial agreement was theirs. She went to the first reading of the will. They knew that she had rights coming under the prenuptial agreements. The old statute, and if you go to our reply brief, the yellow-copied reply brief, that deals with it very specifically because we knew at that point what the estate was contending and so forth. But all the cases that they cite deal with the old statute as it was passed in the Probate Act of 1975. In fact, in 1988, I believe, the U.S. Supreme Court, in the case of Tulsa Professional Collection Services v. Pope, held that it was a violation of due process if an estate knew that there was a claimant, a likely claimant against the estate, and relied solely on publication to advise that claimant of the passing of that individual. And this is the opinion. This is the shepherdization that I look at, and it remains the law. The statute, in fact, was changed in 1989 to comply with what the requirements were of the Supreme Court. And we addressed this in our reply brief, too. It so happens that the Fourth District, this Court, dealt with that issue, I think, before the statute was passed, but after the Supreme Court opinion, and that's cited in the Anderson v. Central Illinois Trucks case, which is here. And the shepherdization isn't quite as thick. At any rate, that's what the law is with regard to the State of Illinois. So I don't do estate work, typically, but if one is to evaluate, is this a known claimant of the estate, and what is the statute of limitations for filing a claim, and one is to look at the statutes as they exist today, which I did this morning, one finds under 755 ILCS 5-18-3, notice that there is no claimant. There is publication. Unfortunately, it comes under publication, but then it says, it is the duty of the representative to publish once each week for three successive weeks, and here's the key language, and to mail or deliver to each creditor of the defendant, of the decedent, whose name and post office address are known to or are reasonably ascertainable by the representative and whose claim has not been allowed or disallowed as provided in Section 1811, a notice. It sets out how long the notice is to be. I think when they send a written notice to a known creditor, they give them, it has to be at least three months. In this case, they only did the publication, and it provided any claim had to be filed by July 15. But there's no dispute that they never sent any notice to Jane, and we believe that Jane is a known creditor. If you look at 755 ILCS 5-18-3 and you're practicing law, you will know you have to give direct notice by mail or some other basis that's equally reliable to known creditors of the passive, and you have to give an indication of when their claim has to be filed. The statute as it exists today also says that if you fail to do so, then any claim that's brought against an estate has to be filed within two years of the death of the decedent, and that's the default statute of limitations. So there can be three different statutes of limitations. One is whatever's set out by publication for unknown creditors. Another is whatever's set out by direct notice to known creditors. And the third is the two years. And basically what the statute for that is 755 ILCS 5-18-12, which says every claim against the estate of a decedent except expenses of administration and surviving spouses or child's award is barred as to all decedents of the estate if notice is given to the claimant as provided in Section 18-3 and the claimant does not file a claim with the representative or the court honored before the date stated in the notice. And then it goes to subparagraph B of 18-12, which says unless sooner barred, all claims which could have been barred under this section are in any event barred two years after decedent's death, whether or not letters of office are issued upon the estate of the decedent. So if a known creditor does not get actual notice from the representative as is required by statute, then the known creditor has two years in which to file their claim. It also requires, the statute also requires, and this is 755 ILCS 5-28-11, prior to closing the estate, that the representative must mail or deliver to all interested persons and accounting and shall file in the court a verified report stating substantially, and number three is, that the notice required by Section 18-3 has been published and that reasonable claimants have not been barred. Reasonable care was used to determine the creditors of the decedent and that all known creditors have been given notice as required under Section 18-3. So before they close the estate, they have, it's the burden of the estate to establish that they took reasonable care to determine what known creditors there were of the decedent and they were given actual notice. In this instance, there's no dispute that the only notice that was provided for was the publication notice. No notice was ever sent to Jane. I don't know if they're going to dispute whether Jane is a known creditor or not, but they had the prenuptial agreement and it was, in fact, it was referred to in the 2007 will that was prepared by Floyd. So they can hardly contend that they're not aware of the prenuptial agreement. When we filed her claim, it was on July 22, 2009. The publication notice said any claim had to be filed by July 15. Well, I didn't see the publication notice, but she never got any written notice as a known creditor anyway, so the two-year statute of limitations should apply. At the same time that we filed the claim against the estate under the prenuptial agreement, we also filed her renunciation of the will. And there's no dispute that that was timely file. So the bottom line here is when this court remanded the case for litigation of her claim against the estate under the prenuptial agreement, we weren't permitted to do so because the trial court found that our claim had not been timely filed. The decedent, Floyd, had passed away in December 2008. The estate had been opened January 9, 2009. The publication notice had indicated any claim has to be filed by July 15. She did not get a copy of the publication notice, nor did she get any notice. And we filed our claim on July 22, which is seven days outside what the old statute would have provided for before the Supreme Court found that that would violate due process. So that's the issue we have to deal with primarily here today. Did we, in fact, file our claim against the estate on July 22, 2009 on a timely basis? Am I out of time? Yes, you are. You'll have additional time for rebuttal. Thank you, Your Honor. Ms. Lorton? Thank you. May it please the Court, Counsel. My name is Attorney Allison Lorton with the law firm of Whitman & Lorton in Jerseyville, and we represent the estate by the co-executives Roger and Clayton Isringhausen as appellees in this matter. This appeal, and what I think counsel argued for the first ten minutes of his oral argument about a prenuptial agreement, we've already been here and argued, litigated, and talked about and delayed the prenuptial agreement. The trial court found it was valid. The appellate court affirmed that decision. The reason why we are here today is based on the second filing, as counsel mentioned, that he filed on July 22, 2009. First, the renunciation. That's been litigated and dealt with. The second thing he filed was a claim, seven days beyond the claims deadline that was published by the estate in this case. Well, actually, maybe it's only one day, because the claim notice is incorrect. The first publication of the claim notice is January 21. The statute says the final date can't be less than six months after that. So the publication is erroneous. The date listed in the publication is erroneous? The July 15 closing. Because it has to be not less than six months after the first publication date. The first publication date is January 21. So six months makes it July 21, doesn't it? Or July 20, July 22, however you count the days of the month. I don't know if that makes any difference, but it's a little bit awkward to be complaining about filings when relying on a publication, when the publication itself doesn't give adequate time for creditors or claimants. If I was a claimant, I'd probably read July 15. I wouldn't stop and think about when the first date was. Well, like I said, I don't have that in front of me, and you may very well be correct. That's not the challenge, though. The challenge raised by the appellant has been, I guess, I didn't get notice. I didn't get adequate notice. The notice that I received, according to the appellant, was only the publication. And my status as, I guess, a widow, as a beneficiary under a will, as a beneficiary under a prenup, I'm entitled under the law the way Mr. Masson interprets the code, is that I'm entitled to mail notice of that same plaintiff's notice, regardless if the date is incorrect or not. Agreed. Agreed. Does the estate have an obligation to the widow to honor the life estate? Yes, and that has been done. Well, except that if the estate has an obligation to her that has any kind of a monetary value to it, she's a creditor. She has a life estate in that home. If the estate sold that house as claimed in the advertisement that had nothing to do with the estate, say the house was sold, she would still have a life estate in that home. The estate couldn't terminate that. The sale doesn't terminate that. It would be subject to. There's nothing we could do or the estate could do to terminate that life estate that was granted to her in the will. Obviously, that has precipitated this entire event. But my point is, if that is an obligation, that puts her in the status of a creditor or a claimant, particularly when she reads something in the newspaper about the house she lives in being sold or being planned to be sold. See, I would disagree with that. If you were the widow and you read that in the newspaper, your eyebrows wouldn't bob and they wouldn't. Well, absolutely. She called Mr. Whitman. In the cases that we cited in our brief, what she's challenging is that I didn't receive notice of the claims deadline. I understand. The notice I received wasn't adequate. The cases we cite in our reply, these same arguments have been raised before and the courts rejected them. You as a widow, your personable partner, she's listed first in our petition to probate the will and administer the probate estate. The widow has received copies of every probate pleading of record. The claims notice is not something that is filed, typically in a court probate case other than the certification. Therefore, this estate of the court record does not have a certificate of service showing the evidence today that it was directly mailed to her. But every other pleading that was filed in that probate case was mailed to the appellate. The appellate, as counsel admitted, was there for the reading of the will. Acknowledged, understood in previous testimony what she was getting under the prenup, what the will said. She testified on behalf of and at the request of the estate on March 16, 2009, in a citation to recover assets hearing dealing with an issue of a lawn mower in the, with regards to the estate. The fact that she didn't know that, with those facts, under the cases that we cited, Winters and Sutherland, her argument that the notice I received either violates my due process or is insufficient as a matter of law, fails. This same argument has been raised and litigated before. Counsel dismisses our citations and our briefs because they interpret the older version of 18-3. They're not dismissed. I completely disagree with that. The reason being is because the argument is still the same. No matter what that published notice says, whether it says a date specific or six months from the date letters of office have been issued, the argument is still the same. The notice that I received, allegedly only publication, is insufficient and violates my due process rights. And under the facts of Winters and Sutherland, that argument has already been rejected. And if I may address the court, what the court said in Winters. Actually, the only authority judge that she cites in her case, in their brief, is Polley v. The Estate of Polley that says, I, a widow, am entitled to mail and actual notice. And I think the distinction that I brought up earlier can be highlighted here. And I want to cite the full citation from Polley v. The Estate of Polley, a 2008 First District case, to highlight that distinction. The court in that case held that the probate act no longer includes a firm six-month limit on the period in which claimants must file any claim against the estate. The date provided in the notice, published and mailed in accordance with Section 18-3, sets the ethical period for filing claims. Because the estate here, in the Polley case, failed to prove that a published and mailed notice is required by 18-3, only the two-year limitations period applies. Therefore, the widow in that case had two years to file a claim. What the court held, and what counsel misinterprets in their reply brief, is not that the two-year statute of limitations applies to the widow's claim because she was a widow or entitled to mail notice. It was because the estate failed to properly shorten the claim period to the six-month or the date listed in the claims notice. Nowhere in the opinion does that case state, suggest, imply, or allude that a widow or somebody who may be getting something, any beneficiary under a will, any recipient under a prenuptial agreement, is an actual creditor entitled to mailed notice in addition to that which is already published. But we don't care whether the case says that. We care whether the statute now says that. So the real question is, is she a readily ascertainable claimant or creditor? Because the change in the statute was, you've got to give actual notice, mailed notice to, you can't rely on publication for the readily or reasonably ascertainable creditor. So my question, going back to, do you have an obligation to her? She's suspicious about the obligation in part because of the notice of sale. I don't read, I guess I'm disclosing something, I don't read that prenuptial agreement as so absolutely clear that it would be a surprise that somebody might say, well, rents, cash that comes into the marriage is personal property. I've got a claim against that. Because it's after acquired property. I understand you could say, no, no, that's not what the prenuptial agreement means. But I didn't find it crystal clear as I was looking at it. Maybe there's an issue with regards to the claim, but that doesn't mean she's not bound by the claim notice that was published. That doesn't mean that she didn't get notice of the claim. Actual notice. Actual notice. There's no requirement under the statute that we have to actually mail her notice. So your view is the things that you did do, even if you didn't do them for the purpose of giving her notice, you did them, in the ordinary routine of handling the estate, she became fully aware of what was going on and should have known or should have found out, figured out that there was a time period within which she needed to file a claim. This court in Anderson, in its opinion, cites the ancillary case of Tulsa, the case of Mennonite. Not every single conceivable creditor of the estate is entitled to mail notice. Yeah, but certainly that's true. But it's not like it's a stretch to think that she might have a claim. I refer the case to the case of Sutherland that we cited in our brief. In that case, it was actually a creditor who opened the estate originally. He was obviously involved in the proceedings and eventually the public administrator took over the handling of that case. The creditor filed his claim. A day beyond the published notice. The court said, why never got mailed notice? And the court in that case held, you weren't entitled to mailed notice. You were personally involved in these probate proceedings. You received knowledge of, excuse me, when the public administrator came into the case. Your attorney was given notice. You had the opportunity to appear in this court. The public administrator in that case, the court found, was not entitled to, in addition to publication, mail you a notice. An indicta in that case. The court even cites, and I'll quote to you from the case, the actions of the public administrator were sufficient in this case, and the public administrator was not further required to take steps mandated by 18-3 of the Probate Act, now in effect, which was not in effect at the time this dispute arose. Effectively saying, even if 18-3 as it exists today was applicable then, he still wouldn't have had the mailed notice. Because of the creditor's relationship to the parties in the case, the involvement, the personal knowledge, bulk proof of the actual notice is for the executors to discern, know, and ask the payable creditors who aren't involved in the probate proceedings from the onset, who have had notice of all of the pleadings, personally participated at the request of and on behalf of the estate prior to the expiration of the claims period. Counsel even acknowledged he was contacted in June 2009 with regards to the advertisements you saw in the paper. I may have an issue here. For a month advised by counsel, but the claim was still untimely filed. That was the basis of, under section 12, the court then had no jurisdiction and it must be barred, and it was the basis of our position, and at that point the trial court agreed. I'd like to move on to the issue with regards to discovery. I'd just like to briefly address a couple of points. The basis of our objection was relevancy. We're dealing with information that happened, first of all, when the deceased was still alive, with regards to farms that are the basis of and the whole point of a valid prenuptial agreement, what happened to those rents. What has morphed from the claim that was filed through arguments and briefing and argument before the trial court was the claim of, not just for marital property, but commingling, you know, where the rents were going to, what accounts they were in, who had access to them, transfers. What was filed, the basic claim for marital property, and what was being argued in response to whether or not this discovery was relevant, was changing, and I think the trial court highlighted that in its order. The trial court specifically asked, find me a case that says non-marital property from a prenup, income derived by that that's used according to the prenup to support the parties throughout their relationship and throughout their marriage is somehow converted to marital property. The appellate couldn't do that. Couldn't find such authority and hasn't, in my opinion, in my reading of his cases, hasn't been able to do that today, so therefore our objections to the discovery should be sustained. And I would concede the remainder of my time unless the court has any further questions of me. I don't see any. Thank you. Thank you very much. Rebuttal? Thank you, Your Honor. Counsel, just very briefly, I would ask the court to address the issue of commingling if, in fact, they're going to remand this court for further proceedings because I think there has been some confusion on the part of the trial court. Again, this has to do with how the family lived as a couple with, you know, what the court wants to do is pick two dates, 1981 and 2008, and separate those out. You need to understand that we're not really in the business of giving advisory opinions. I recognize that, and I'm concerned that we're going to run into that issue again when we go back. Let me address the issue of whether our claim was timely filed. If, in fact, I did not act quickly enough when Mrs. Isringhausen contacted me, that's my claim. First of all, they acknowledge that she had no knowledge of the July 15, 2009 deadline that was set out in the publication notice. That was not part of the file. She had no knowledge of that. You recognize, Your Honor, that that was not properly given anyway. It doesn't cover the six months. And Floyd Isringhausen recognizes what you recognized, that there is some ambiguity in the language of the prenuptial agreement. In his will, Section 5, the one that was prepared in May 2007 that they're relying on, he says, It is my position that any livestock or machinery that I own at my death is not affected by the above-referenced antenuptial agreement. While those items were purchased after my marriage to Jane, they were replacements of machinery and livestock that I had before marriage, not additional property that could be considered property acquired after marriage, as intended by the language in paragraph 4F of the antenuptial agreement, whereby my spouse would own a one-half interest in said items. And he says, It is my desire and direction that those items in their entirety pass to the children. But then he says, If my interpretation is not correct, then the camping trailer and truck, which I am not bound by the antenuptial agreement to give to Mary Jane, shall be distributed according to the residuary part of this estate. He says exactly what you recognize, Your Honor, that there is a challenge here. There is a question as to how that's to be interpreted. Whether it can be modified by a 2007 will, 26 years after it was entered into, and 26 years after they lived as husband and wife together, is an issue that we can proceed on. Jane has been prohibited from proceeding on those matters because of the fact that she filed her claim on July 22nd. Had she filed it on July 15th, there's no disputes. But I think if we look at the statute, she is entitled to actual knowledge of a cutoff date for when her claim is to be brought. That's what the statute says. I think there's ample information about whether paragraph 4F makes her a claimant under the estate or not. They were doing all kinds of stuff with regard to stuff that came under 4F. They sold both farms in June of 2009. They had an estate sale earlier, several months before. She was entitled to actual knowledge. She has been denied that. Time is ticking. She's been pursuing this claim for three years, and we would ask that she be given the opportunity to proceed with that. Thank you, Your Honors. Thank you, counsel. We'll take this matter under advisement and stand in recess until 1 o'clock.